1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF TEXAS
2                   HOUSTON DIVISION

3   UNITED STATES OF AMERICA      .  CR. NO. H-16-460-1
                                  .  HOUSTON, TEXAS
4   VS.                           .
                                  .  JUNE 13, 2018
5   LISA YVETTE COFFMAN           .  9:00 A.M. to 12:28 P.M.

6

7                        DAY 3 of 3
                    TRANSCRIPT of TRIAL
8          BEFORE THE HONORABLE MELINDA HARMON
             UNITED STATES DISTRICT JUDGE, and a JURY

9

10  APPEARANCES:

11

12  FOR THE GOVERNMENT:          MS. JENNIE L. BASILE
                                 MR. CHARLES ESCHER
                                 Office of U.S. Attorney
13                               1000 Louisiana
                                 Suite 2300
14                               Houston, Texas   77002

15

16  FOR THE DEFENDANT:           MR. ROBERT J. FICKMAN
                                 Attorney at Law
17                               440 Louisiana
                                 Suite 200
18                               Houston, Texas   77002

19                               MR. WENDELL ODOM
                                 Odom & Davis
20                               440 Louisiana St.
                                 Suite 200
21                               Houston, Texas   77002

22  THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER THE
    CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED BY
23  COURT ORDER.   UNAUTHORIZED REPRODUCTION WILL RESULT IN AN
    ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND ONE
24  COPY AT THE OFFICIAL RATE.   General Order 94-15, United States
    District Court, Southern District of Texas.
25  Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription.

1                       APPEARANCES CONTINUED

2   OFFICIAL COURT REPORTER:           MS. KATHY L. METZGER
                                       U.S. Courthouse
3                                      515 Rusk
                                       Room 8004
4                                      Houston, Texas   77002
                                       713-250-5208
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

                                                           PAGE

JURY CHARGE                                                  4


CLOSING ARGUMENTS

By Ms. Basile                                               18
By Mr. Fickman                                             27
By Mr. Odom                                                36
By Mr. Escher                                              46


VERDICT                                                     56

* * *

```
 1                    P R O C E E D I N G S
 2         (Open court, defendant and jury present.)
 3            THE COURT:  Please be seated, ladies and gentlemen.
 4                   All right.  This morning we are going to begin
 5     with my reading to you the charge, which is a document that
 6     tells you what the law is in this case and you will be able to
 7     take this charge back with you into the jury room and consult
 8     it from time to time as you need to during your deliberations.
 9                   Members of the jury, in any jury trial there are,
10     in effect, two judges.  I am one of the judges, and the other
11     is the jury.  It is my duty to preside over the trial and to
12     determine what evidence is proper for your consideration.  It
13     is also my duty at the end of the trial to explain to you the
14     rules of law that you must follow and apply in arriving at your
15     verdict.
16                   First, I will give you some general instructions
17     which apply in every case, for example, instructions about
18     burden of proof and how to judge the believability of
19     witnesses.  Then I will give you some specific rules of law
20     about this particular case, and finally I will explain to you
21     the procedures you should follow in your deliberations.
22                   You, as jurors, are the judges of the facts, but
23     in determining what actually happened, that is, in reaching
24     your decision as to the facts, it is your sworn duty to follow
25     all of the rules of law as I explain them to you.
```

1          You have no right to disregard or give special

2     attention to any one instruction or to question the wisdom or

3     correctness of any rule I may state to you.  You must not

4     substitute or follow your own notion or opinion as to what the

5     law is or ought to be.  It is your duty to apply the law as I

6     explain it to you, regardless of the consequences.

7          It is also your duty to base your verdict solely

8     upon the evidence without prejudice or sympathy.  That was the

9     promise you made and the oath you took before being accepted by

10    the parties as jurors, and they have the right to expect

11    nothing less.

12         The indictment or formal charge against the

13    defendant, Lisa Yvette Coffman, is not evidence of guilt.

14    Indeed, she is presumed by the law to be innocent.  The law

15    does not require Ms. Coffman to prove her innocence or to

16    produce any evidence at all.  And the government has the burden

17    of proving beyond a reasonable doubt that Ms. Coffman is guilty

18    of the crime charged.  She is not on trial for any act,

19    conduct, or offense not alleged in the indictment.  Neither are

20    you to -- neither are you concerned with the guilt or innocence

21    of any other person or persons.

22         Ms. Coffman did not testify in this case.  Under

23    our Constitution, she has no obligation to testify or to

24    present any evidence -- any other evidence, because it is the

25    government's burden to prove her guilt beyond a reasonable

1  doubt.   That burden remains with the government throughout the

2  entire trial and never shifts to Ms. Coffman.   Ms. Coffman is

3  never required to prove she is innocent.   You may not attach

4  any significance to the fact that Ms. Coffman did not testify.

5  No adverse inference against her may be drawn by you because

6  she did not take the witness stand.   You may not consider this

7  against Ms. Coffman in any way in your deliberations in the

8  jury room.

9       While the government's burden of proof is a

10  strict or heavy burden, it is not necessary that Ms. Coffman's

11  guilt be proved beyond all possible doubt.   It is only required

12  that the government's proof exclude any reasonable doubt

13  concerning the defendant's guilt.

14       A "reasonable doubt" is a doubt based upon reason

15  and common sense after careful and impartial consideration of

16  all the evidence in the case.   Proof beyond a reasonable doubt,

17  therefore, is proof of such a convincing character that you

18  would be willing to rely and act upon it without hesitation in

19  the most important of your own affairs.

20       As I told you earlier, it is your duty to

21  determine the facts.   In doing so, you must consider only the

22  evidence presented to you during the trial, including the sworn

23  testimony of the witnesses and the exhibits.   Remember that any

24  statements, objections, or arguments made by the lawyers are

25  not evidence.   The function of the lawyers is to point out

 1  those things that are most significant or most helpful to their

 2  side of the case, and in so doing, to call your attention to

 3  certain facts or inferences that might otherwise escape your

 4  notice.   In the file analysis, however, it is your own

 5  recollection and interpretation of the evidence that controls

 6  in this case.   What the lawyers say is not binding upon you.

 7           During the trial I sustained objections to

 8  certain questions.   You must disregard those questions

 9  entirely.   Do not speculate as to what the witness would have

10  said if permitted to answer the question.   Your verdict must be

11  based solely on the legally admissible evidence and testimony.

12           You will note that we do have an official court

13  reporter making a record of the trial, but we will not have

14  typewritten transcripts of this record available for your use

15  in reaching a decision in the case.

16           If you took notes during the trial, your notes

17  should be used only as memory aids.   You should not give your

18  notes precedence over your independent recollection of the

19  evidence.   If you did not take notes, you should rely upon your

20  own independent recollection of the proceedings and you should

21  not be influenced by the notes of other jurors.   Notes are not

22  entitled to any greater weight than the memory or impression of

23  each juror as to what the testimony may have been.   Whether you

24  took notes or not, each of you must form and express your own

25  opinion as to the facts of the case.

1          Charts and summaries have been received into

2    evidence.   Charts and summaries are valid only to the extent

3    that they accurately reflect the underlying supporting

4    evidence.   You should give them only such weight as you think

5    that they deserve.

6          Do not assume from anything I may have done or

7    said during the trial that I have any opinion concerning any of

8    the issues in this case.   Except for my evidentiary rulings

9    during the trial and instructions to you on the law, you should

10   disregard anything I may have said during the trial in arriving

11   at your own findings as to the facts.

12         While you should consider only the evidence, you

13   are permitted to draw such reasonable inferences from the

14   testimony and exhibits as you feel are justified in the light

15   of common experience.   In other words, you may make deductions

16   and reach conclusions that reason and common sense lead you to

17   draw from the facts which have been established by the

18   evidence.

19         You should not be concerned about whether the

20   evidence is direct or circumstantial.   Direct evidence is the

21   testimony of one who asserts actual knowledge of a fact, such

22   as an eyewitness.   Circumstantial evidence is proof of a chain

23   of events and circumstances indicating that something is or is

24   not a fact.   The law makes no distinction between the weight

25   you may give to either direct or circumstantial evidence.   But

1   the law requires that you, after weighing all of the evidence,

2   whether direct or circumstantial, be convinced of the guilt of

3   the defendant beyond a reasonable doubt before you can find

4   Ms. Coffman guilty.

5              I remind you that it is your job to decide

6   whether the government has proved the guilt of Ms. Coffman

7   beyond a reasonable doubt.  In doing so, you must consider all

8   of the evidence in -- consider all of the evidence.  This does

9   not mean, however, that you must accept all of the evidence as

10   true or accurate.

11              You are the sole judges of the credibility or

12   believability of each witness and the weight to be given the

13   witness's testimony.  An important part of your job will be

14   making judgments about the testimony of the witnesses.  You

15   should decide whether you believe all or any part of what each

16   witness -- I'm sorry.  All or any part of what each person had

17   to say and how important that testimony was.  In making that

18   decision I suggest that you ask yourselves a few questions:

19   Did the person impress you as honest?  Did the witness have any

20   particular reason not to tell the truth?  Did the witness have

21   a personal interest in the outcome of the case?  Did the

22   witness have any relationship with either the government or the

23   defense?  Did the witness seem to have a good memory?  Did the

24   witness clearly see or hear the things about which he or she

25   testified?  Did the witness have the opportunity and ability to

1    understand the questions clearly and answer them directly?  Did

2    the witness's testimony differ from the testimony of other

3    witnesses?  These are a few of the considerations that will

4    help you determine the accuracy of what each witness said.

5              Where a defendant has offered evidence of good

6    general reputation for truth and veracity, honesty and

7    integrity, or character as a law-abiding citizen, you should

8    consider such evidence along with all the other evidence in the

9    case.

10              Evidence of a defendant's character, inconsistent

11    with those traits of character ordinarily involved in the

12    commission of the crime charged, may give rise to a reasonable

13    doubt, since you may think it improbable that a person of good

14    character with respect to those traits would commit such a

15    crime.

16              Your job is to think about the testimony of each

17    witness you have heard and decide how much you believe of what

18    each witness had to say.  In making up your mind and reaching a

19    verdict, do not make any decisions simply because there were

20    more witnesses on one side than the other.  Do not reach a

21    conclusion on a particular point just because there were more

22    witnesses testifying for one side on that point.

23              The law does not require the prosecution to call

24    as witnesses all persons who may have been present at any time

25    or place involved in the case, or who might appear to have some

1   knowledge of the matters at issue in this trial.  Nor does the
2   law require the prosecution to produce as exhibits all papers
3   and things mentioned in the evidence.

4              You will note that the indictment charges that
5   the offense was committed on or about a specified date.  The
6   government does not have to prove that the crime was committed
7   on that exact date, so long as the government proves beyond a
8   reasonable doubt that the defendant committed the crime on a
9   date reasonably near the date stated in the indictment.

10             You are instructed that a violation of civil
11  statutes, rules, regulations, ethical standards, or standards
12  of care is not a crime.  This is not a civil case.  Ms. Coffman
13  is not on trial for a civil violation.  Even if you find the
14  claims were not allowable under the applicable statutes, rules,
15  and regulations, Ms. Coffman cannot be convicted of a crime
16  merely for breaching civil standards, rules, regulations,
17  ethical standards, and standards of care applicable to her
18  conduct.  However, the Department of Labor's rules and
19  regulations, ethical standards and standards of care may be
20  relevant in determining whether Ms. Coffman acted with criminal
21  intent, that is, knowingly, willfully, and with the intent to
22  defraud the Department of Labor.  That is how you must consider
23  this evidence.

24             You are here to decide whether the government has
25  proved beyond a reasonable doubt that Ms. Coffman is guilty of

1   the crime charged.  If Ms. Coffman is found guilty, it will be
2   my duty to decide what the punishment will be.  You should not
3   be concerned with punishment in any way.  It should not enter
4   your consideration or discussion.
5                A separate crime is charged in each count of the
6   indictment.  Each count and the evidence pertaining to it
7   should be considered separately.  The fact that you may find
8   the defendant guilty of -- I'm sorry.  The fact that you may
9   find the defendant guilty or not guilty as to one of the crimes
10  charged should not control your verdict as to the other.
11               Specific Instructions.  Count 1.  Count 1 of the
12  indictment alleges in pertinent part, and I quote:  "From or
13  about November 15, 2011, and continuing through on or about
14  May 4, 2016, in the Houston Division of the Southern District
15  of Texas and elsewhere, Defendant Lisa Yvette Coffman, with
16  intent to defraud, did knowingly and willful make false,
17  fictitious, and fraudulent representations for receipt of
18  workers' compensation or other benefits or payments under
19  Subchapter I and III of Chapter 81 of Title 5, specifically did
20  file false Form 957 reports with the Department of Labor,
21  Office of Workers' Compensation Program, in connection with the
22  receipt of medically-related travel benefits to which the
23  defendant was not entitled, specifically money and funds in
24  excess of $1,000, all in violation of Title 18, United States
25  Code, section 1920," closed quote.

1          Title 18, United States Code, Section 1920 makes

2     it a crime to make a false statement to obtain federal

3     employees' compensation.  For you to find Ms. Coffman guilty,

4     the government must prove each of the following beyond a

5     reasonable doubt:

6          First, that Lisa Yvette Coffman knowingly and

7     willfully made or used a false written statement or report

8     knowing the false written statement or report contained a

9     false, fictitious, or fraudulent written statement or entry;

10          Second, that the report was material;

11          Third, that Lisa Yvette Coffman did so in

12     connection with the application for a receipt of workers'

13     compensation or other benefits or payment under Title 5, United

14     States Code, Section 81 and following;

15          And, fourth, that the amount of the compensation,

16     benefit, or payment exceeded $1,000.

17          The employee is entitled to reimbursement of

18     reasonable and necessary expenses, including transportation

19     needed to obtain authorized medical services, appliances or

20     supplies.  To determine what is a reasonable distance to

21     travel, the Officer of Workers' Compensation Programs, OWCP,

22     will consider the availability of services, the employee's

23     condition, and the means of transportation.

24          The standard form designated for medical travel

25     refund requests is OWCP-957 and must be used to seek

1  reimbursement for travel costs.

2  　　　　　Count 2.  Count 2 of the indictment alleges in

3  pertinent part, and I quote:  "From on or about November 15th,

4  2011, and continuing through on or about May 4th, 2016, in the

5  Houston Division of the Southern District of Texas and

6  elsewhere, Defendant Lisa Yvette Coffman did willfully and

7  knowingly embezzle, steal, convert, and purloin money from the

8  Department of Labor, a department or agency of the United

9  States, specifically money and funds in excess of $1,000

10  related to workers' compensation disability benefits travel

11  reimbursements, to which the defendant was not entitled, all in

12  violation of Title 18, United States Code, Section 641."

13  　　　　　Title 18 -- closed quote.  Title 18, United

14  States Code, Section 641 makes it a crime for anyone to

15  embezzle, steal, knowingly convert any money, property, or

16  thing of value belonging to the United States having an

17  aggregate value of more than $1,000.

18  　　　　　For you to find Ms. Coffman guilty, the

19  government must prove each of the following beyond a reasonable

20  doubt:  First, that the money described in the indictment

21  belonged to the United States government and had a value in

22  excess of $1,000;

23  　　　　　Second, that Lisa Yvette Coffman embezzled,

24  stole, or knowingly converted such money to her own use;

25  　　　　　And, third, that Lisa Yvette Coffman did so

1   knowingly and willfully and with specific intent to deprive the

2   owner of the use of the money.

3           It is not necessary to prove that Ms. Coffman

4   knew that the United States government owned the property at

5   the time of the wrongful taking.

6           To quote, "embezzle," closed quote, means to

7   wrongfully, intentionally take money, property, or thing of

8   value of another after the money, property, or thing of value

9   has lawfully come within the possession of the person taking

10  it.

11          I'm not sure that's correct.  Is that correct?

12  Should it be lawfully or unlawfully?

13          MR. ESCHER:  I think it's correct, Your Honor.

14          THE COURT:  It's correct?  Okay.  I'm going to read it

15  again just to make sure it sounds right to me.

16          To embezzle means to wrongfully, intentionally

17  take money, property, or thing of value of another after the

18  property -- money, property, or thing of value has lawfully

19  come within the possession of the person taking it.

20          To, quote, "steal," closed quote, or, quote,

21  "knowingly convert," closed quote, means to wrongfully take

22  money, property, or thing of value belonging to another with

23  the intent to deprive the owner of its use or benefit either

24  temporarily or permanently.  Any applicable change of the

25  location of the property with the intent to deprive constitutes

1  a stealing, whether or not there is an actual removal of it

2  from the owner's premises.

3         The word, quote, "knowingly," closed quote, as

4  that term is used in these instructions means that the act was

5  done voluntarily and intentionally, not because of mistake or

6  accident.

7         The word, quote, "willfully," closed quote, as

8  that term is used in these and other instructions means that

9  the act was committed voluntarily and purposefully, with the

10  specific intent to do something the law forbids; that is to

11  say, with the bad purpose to disobey or disregard the law.

12  While a person must have acted with the intent to do something

13  that the law forbids before you can find that person acted

14  willfully, the person need not be aware of the specific law or

15  rule that his or her conduct violates.

16         A representation is false if it is known to be

17  untrue or is made with reckless indifference as to the truth or

18  falsity.  A representation is also false when it constitutes a

19  half truth or effectively omits or conceals a material fact,

20  provided it is made with intent to defraud.

21         A false representation is, quote, "material,"

22  closed quote, if it has a natural tendency to influence or is

23  capable of influencing the Department of Labor in issuing

24  workers' compensation benefits.

25         Verdict.  To reach a verdict, all of you must

agree.  Your verdict must be unanimous.  Your deliberations will be secret.  You will never have to explain your verdict to anyone.

It is your duty to consult with one another and to deliberate in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence in the case with your fellow jurors.  In the course of your deliberations do not hesitate to reexamine your own opinions and change your mind if you are convinced that you were wrong, but do not give up your honest beliefs as to the weight or effect of the evidence solely because of the opinions of your fellow jurors or for the mere purpose of returning a verdict.

Remember at all times, you are the judges of the facts.  Your sole interest is to seek the truth from the evidence in the case, to decide whether the government has proved the accused guilty beyond a reasonable doubt.

When you go to the jury room, the first thing you should do is select one of your number as your foreman who will help to guide your deliberations and who will speak for you here in the courtroom.  A form of verdict has been prepared for your convenience.

The foreman will write the unanimous answer of the jury in the space provided, either guilty or not guilty, and should date and sign his or her name after each answer on

1    the verdict form.

2             If you need to communicate with me during the

3    your deliberations, the foreman should write the message and

4    give it to the marshal.   I will either reply in writing or

5    bring you back into the courtroom to answer your message.

6             Bear in mind that you are never to reveal to any

7    person, not even to the Court, how the jury stands numerically

8    or otherwise until after you have reached a unanimous verdict.

9             All right.   We're now going to the closing

10   arguments.   Ms. Basile.

11        *MS. BASILE:*   Thank you, Your Honor.

12             Good morning, ladies and gentlemen.   You have now

13   heard from all the witnesses in the case and you have seen all

14   of the evidence and exhibits in the case.   The Judge just read

15   to you instructions and the elements that the government needs

16   to prove to you beyond a reasonable doubt, and there's also

17   some definitions in here.

18             The first definition I would like to go over with

19   you briefly is on page 3, a reasonable doubt.   As Mr. Escher

20   told you in the very beginning of the case, it's not beyond any

21   doubt.   It's beyond a reasonable doubt.   And you can read that

22   paragraph again for yourselves, but what I want you to take

23   away from that paragraph is in your deliberations, never forgot

24   to use your common sense.

25             Now, I would like to go over with you each of the

1   elements for both of the crimes charged and how the government

2   has proved them beyond a reasonable doubt.   The Judge just read

3   to you that Count 1, the -- excuse me -- Count 1, the making of

4   false statements in order to obtain workers' compensation

5   benefits has four elements.

6              Mr. Escher would probably tell you I'm in my

7   wrong brain, but I would like to start with No. 3 and 4.   If we

8   could go to No. 3, it says, That Lisa Coffman did so in

9   connection with the application or receipt of workers'

10  compensation or other benefit or payment under Title 5, United

11  States Code, Section 8101, *et seq*.   And what that means is

12  there's more parts of that statute.

13             Again, that's just fancy language.   Barbara

14  Russell told you that that's the title, that's the statute,

15  federal statute that controls workers' compensation benefits.

16  So, if we read that paragraph again, it's just the other

17  elements, she did so in connection with workers' compensation.

18             It's that simple, ladies and gentlemen, and no

19  one disagrees here.   As we told you, no one disagrees that

20  Ms. Coffman had a back injury and that she filed Government's

21  Exhibit 1, and that then workers' comp accepted her claim.   And

22  you can look for yourself and see what she received back, as

23  Exhibit 2.   Right?   There's no disagreement by either side that

24  she had this injury, she was entitled to workers' compensation

25  benefits and that she was even entitled to travel reimbursement

1  benefits and that that's all the other elements she did in

2  connection with the workers' comp statute.  Okay?

3           Now, the fourth one, the amount of the

4  compensation benefit or payment exceeded a thousand dollars.

5  You each have a copy of Government's Exhibit 9 already.  And if

6  you look at page -- the last page, page 4, I believe it is,

7  Special Agent Ponder told you that he painstakingly reviewed

8  each and every one of these, over 489 submissions, with both

9  most of them having three entries per page to determine that

10  there were -- there were over 1450 submissions and that very

11  few of them were supported by doctors' visits.  And he only

12  analyzed in this one paper for you 1340 of them and compared

13  them to seven of the known doctors.

14          He told you-all that.  And the total of fraud,

15  giving her the benefit of every possible mile calculation,

16  giving her less miles for the money received and more miles for

17  the nonsupported claim, more cents per mile, if you will, the

18  total fraud was $46,000 -- over $46,000, ladies and gentlemen,

19  well over the $1,000 that the United States needs to prove to

20  you.

21          But even if you put aside the total, if you just

22  take one of the doctor's offices, if you just look at page 2,

23  Allied Medical Center, you heard Emily Gutierrez came in here

24  from Allied Medical Center.  You saw Government's Exhibit 6.

25  And she counted up for you right in front of you, you know,

1  there was weird billing codes on all those reports, but it said

2  acknowledged or whatever their own code was, she told you 20

3  times Lisa Coffman came to their office.  But when Agent Ponder

4  went back and looked at every single one of these documents and

5  wrote down for himself Allied Medical Center and different

6  amounts of mileage, he was able to find 435 times that Lisa

7  Coffman says she went to Allied Medical Center.  The fraud for

8  just one doctor, ladies and gentlemen, is $11,000, again, well

9  over the $1,000 that the government needs to prove to you.

10              Okay.  Those are the last two elements of the

11  first count.

12              Let's now look at the second element, that the

13  report was material.  This is a very simple element, ladies and

14  gentlemen.  If you don't submit this 957 form, you're not going

15  to get any money.  That's about as material as it gets, ladies

16  and gentlemen.  If you don't give this to someone and ask for

17  reimbursement, you don't get any money.  This report is

18  material.  Every single one of these is material; and without

19  sending one in, you're not getting reimbursement.  That's all

20  that element means.

21              Now, the last element is, if you will, the most

22  disputed element between the two sides.  The defense would like

23  you to believe that Ms. Coffman was on so many drugs that she

24  was confused, that when she filled out these forms, she made

25  mistakes, ladies and gentlemen.  But the evidence doesn't

1    support that.  Government's Exhibit 13 shows you willful,

2    intentional, knowing, deceitful conduct, ladies and gentlemen.

3                    Special Agent Ponder told you that over the years

4    the stacks grew.  If you break these apart for yourself in the

5    jury room and put 2011, 2012, 2013, 2014, 2015, 2016, the

6    stacks grew.  And by the end, this is a person who realized

7    that Conduent would process her claim no matter what she put on

8    there, the government was going to pay her no matter what she

9    wrote on these forms, and she upped the ante, ladies and

10   gentlemen.

11                   Barbara Russell told you that just for a few of

12   these dates, not even this entire four months, she received

13   over $10,000, $10,000 just for filling out forms in a couple

14   day period.  And if you look at the forms for yourself, like

15   Barbara Russell and William Ponder did, the last 109 pages that

16   correspond to this chart, you will see what Agent Ponder told

17   you, a methodical, calculated date, date, date with this

18   doctor; date, date, date with this doctor; and then switching

19   to another doctor, date, date, date, date.  Sequential, willful

20   conduct, ladies and gentlemen.

21                   This is not a mistake.  When someone makes a

22   mistake over a five-year period, maybe they have 10 dates off

23   or 50 dates off or a hundred dates off of service, but not

24   13 -- over 1300 dates where there's no supporting doctor's

25   appointment.  This is not a mistake, ladies and gentlemen.

1        That element also tells you that she prepared

2   false written statements.  Let's talk about the false written

3   statements.  You heard from Agent Ponder that when he showed

4   her these, she agreed that that was her signature on every

5   single one of these.  So, every single one of these that

6   doesn't have a supporting doctor's visit, each time it's a

7   false statement.

8        I would also -- you also heard that she didn't

9   even live at this address that you see on every doctor's office

10  visit, on every document in this entire case.  The CA-1 form,

11  the acceptance form, and every single one of these, she put

12  this address, ladies and gentlemen.  If that is not a correct

13  address, that in and of itself is a false statement.  These

14  forms are full of false statements.

15       The biggest false statement are all the entries

16  with no supporting doctor's appointment and all the crazy

17  different mileages.  The government in its calculation, Agent

18  Ponder told you in Exhibit 9, always gave her the benefit of

19  the doubt and picked the furthest mileage from those Google

20  maps, the A exhibits, 6A, 7A.  But one time, if you look at

21  Jennifer Caldwell, the government gave her 50 miles round-trip

22  every time she went there.  One time she put 130 miles, ladies

23  and gentlemen.  That is not a mistake.  That is a calculated

24  willful, deceitful, intentional act to get more money.

25       Those are the four elements for the first count

1    of the indictment, ladies and gentlemen.  And the actual

2    wording of -- is above the elements for the indictment.

3    Basically the indictment has the same words and then you break

4    it down into four elements, and those are the four elements we

5    just talked about.

6            Now, let's go to Count 2.  Count 2 has some

7    similar elements, but they're slightly different.  So, Count 2

8    is that she stole money from the United States government.

9    Right?  It only has three elements.  The first one, again,

10   talks about this over a thousand dollars.  And we told you that

11   if you look at Government's Exhibit 9, it's well over $46,000,

12   but you can just look at some of the doctors' offices.

13           Let's look at one more example on Government's

14   Exhibit 9.  Those two doctors at the back, where they didn't

15   even take workers' compensation.  And in her interview with

16   Agent Ponder, she told him she had to pay Dr. Tri Le out of her

17   private insurance, because she knew they didn't take workers'

18   comp.  She also told him she stopped going to Dr. Caldwell

19   because she didn't take workers' comp.  Yet these two doctors

20   who didn't take workers' comp, she committed over $20,000 in

21   claims for travel reimbursement, ladies and gentlemen, just

22   those two doctors.

23           Now, that element is slightly different than the

24   first one.  It also has the thousand dollars, but it says that

25   the money belonged to the United States government.  Well, we

know that these forms went to the Department of Labor and were
processed and then we can look at Government's Exhibit 5 and
see all the Treasury checks and Treasury electronic deposits
that she received.  At first they were Treasury checks with the
fancy Treasury seal on them and later they're directly
deposited into her account.  The Department of Treasury, the
Department of Labor, it's all the U.S. government and it's all
money that was the possession of the U.S. government.  That's
the first element of the second crime.

The second element of the second crime is that
she embezzled, stole, or knowingly converted such money to her
own use.  Well, there's no evidence in this case, ladies and
gentlemen, that any of that money was ever returned.  We have
the evidence of it going directly into her bank account and the
government is still owed that money.

Ladies and gentlemen, Lisa Coffman made these
false forms, received reimbursement, and stole that money.
Now, if you were confused and you filled out a bunch of forms
in a couple of days, claiming you went to the doctor 20 times a
week or five times a day and then all of a sudden you get a
remittance voucher in the mail at a time when you're not
confused -- all the witnesses told you that testified on her
own behalf, that sometimes she was lucid.  Her postal employee
friends said she didn't take any drugs at work.  So, at some
point you would see a remittance voucher and see the government

just paid me $10,000 and you would see $10,000 in your bank
account.  If you made a mistake, you would correct it.  You
could correct it, right?  This wasn't a mistake, ladies and
gentlemen.  This was a person filling out false forms and
stealing money from the United States government.

The last one is very similar to the first count,
and it says, again, that Lisa Coffman did so knowingly and
willfully and with specific intent to deprive the owner of the
use of money.  I gave you other examples of knowingly and
willfully.  But let's talk again about this date, just one date
on this chart, March 23rd, where she says she had five doctors'
appointments in Houston, Texas, area, Humble, Houston, Texas,
area, and that she drove 391 miles to five doctors'
appointments in one day.

All the witnesses who testified from those
different doctors' offices, they told you she didn't have an
appointment that day.  So, you don't make a mistake five times,
ladies and gentlemen, and you don't put mileage of 391 miles
unless you're willfully, intentionally deceiving the United
States government in order to get more money.

There's one other thing I want you to recall,
ladies and gentlemen.  The postal employee, Ms. Holmes, who
testified.  She told you that she also had a workers' comp
injury.  I believe it was her neck.  And she told you that she
needed to see doctors over a two-year period, and that she also

1   filled out those reimbursement forms.  She recalled that she

2   received approximately 200 -- I'm sorry, $400 in two years for

3   travel reimbursement.  Now, of course, everybody's pain is

4   different.  Everybody's doctor's appointment would be

5   different, but they're not ten times different, ladies and

6   gentlemen.  You would expect more claims in a five-year period

7   than a two-year period, but not ten times more, not $48,000 of

8   travel reimbursement.

9            When you recall all of the witnesses in this

10   case, ladies and gentlemen, and you review for yourself, I hope

11   that you will look at those forms she filled out and look at

12   the dates and look at the methodical, willful, intentional

13   actions of the defendant.  When you have looked at all the

14   evidence and recall what the witnesses told you, you will be

15   convinced beyond a reasonable doubt that Lisa Coffman is guilty

16   of both of the counts in the indictment.  At that time I ask

17   you to return a verdict of guilty to each count.

18            MR. FICKMAN:  It is a difficult thing to know what is

19   in someone's mind.  Some of us probably are better at it than

20   others.  On TV when I was a kid, there was a guy named Kreskin

21   that could read people's minds.  I never bought that, but I

22   think he made a lot of money then.

23            Well, was there overbilling here?  Yes.  Nobody

24   went to appointments 47 billion times or whatever this chart

25   shows.  The question in this case, ladies and gentlemen, is, is

1   this just a case about overbilling or is it also a case about

2   overmedicating?  Now, you can look at part of the facts or you

3   can look at all of the facts.  And we would urge you to look at

4   all of the facts.  And all of the facts aren't just about

5   billing, as I think the government would like you to focus on,

6   just billing, billing, billing.  There's a whole other layer

7   here, and that's what happened to this lady from the time she

8   got injured till 2016, '17, and even now.  Actually for seven

9   years, because it was in May of 2011 that she was injured and

10  now we're in May -- or actually we're in June of 2018.  So,

11  that's actually seven years.  And in those seven years, what

12  happened?  In those seven years, she's been medicated.  And you

13  think about that for a second.

14          The government has tossed around this number of

15  1400 and some-odd submissions.  I've got a number for you.  365

16  days a year times 5 years is 1825.  1825.  If our client took a

17  painkiller every day -- and we know she took painkillers.  You

18  heard all about painkillers from the beginning until end.  She

19  took a painkiller every day, that would be 1825 painkillers

20  alone over a five-year period.

21          Now, we can sit here and go, oh, that wouldn't

22  have affected the person.  We can all do that.  But would that

23  be true?  Would that be honest?  If somebody takes painkillers

24  over that period of time and you add to that, on top of

25  Vicodin -- when you heard she got Vicodin the first week right

1    after the injury, it was -- Mr. Odom brought out evidence that
2    she was prescribed Vicodin right away, right away, and then you
3    heard later on she was on Vicodin, the doctor.  She was on
4    hydrocodone, Vicodin.  Her doctor was a very good soul.  So,
5    you could tell, she was a good doctor.  She meant well.
6               And later we know that now she's on morphine, a
7    morphine patch.  What did the doctor tell you about the
8    morphine?  She was aghast.  No, no, I wouldn't put her on
9    morphine.  I said, Did you put her on morphine?  Oh, no.  Why
10   not?  Because morphine is what you give people when they come
11   out of surgery.  Morphine is what you give somebody when
12   they've been cut on and they cut out -- they've cut something
13   out of somebody and they cut, when they have surgery.  That's
14   what they're on.  Any of us that has ever had surgery, they
15   dope us up and they give us the strongest painkiller they can.
16   And one of those is morphine.
17              That's what our client is on now, an honest
18   injury on the job, nobody disputed that, and put her on
19   morphine.  And the good doctor that came down here was aghast
20   at that, no way.  When I asked her, Would you put her on
21   morphine?  No, of course, not, inappropriate.
22              And at some juncture, the medication grew.  Now,
23   the government pointed out that the billing grew over time.
24   Well, there's an increment here in the medication as well.  Is
25   there a connection, a probable connection?  You've got

1    medication growing.  You've got billing growing.  If a person

2    is less stable upstairs in the cabeza, is their billing going

3    to be less stable?  Is it going to be stable?  I don't think

4    so.  Is this -- I mean, this has got red flags all over it.

5    This is not -- this is -- a confused mind produces something

6    like this.

7            Morphine.  Think about it this way:  Let's make

8    it personal.  If you think about it, if you ever had any kind

9    of procedure or surgery and when you came out of that procedure

10   and if you were asked to fill out forms while you were still

11   under the heavy sedation, just waking up, remembering how that

12   is in your own life experience, would that be a good time to be

13   filling out any kind of forms?  Of course not.  That's why

14   typically we have family there with us when we come out of

15   procedures.  That's why they tell you on the instructions on

16   pharmaceutical products like these, don't drive, don't do

17   anything significant or important.

18           But this lady, our client, Ms. Coffman has lived

19   on pain meds for seven years now.  The indictment covers five

20   of those years.  And it's not something that you can just

21   stash.  I mean, I guess you can.  But I don't think that's an

22   honest appraisal of these facts.  Leaving more in here, which

23   is her state of mind, because that's really what this is all

24   about.  Her intent.  Where do you find her intent?  You find it

25   from her state of mind.  In her state of mind, you can't ignore

1  that it was -- her mind was heavily medicated.  To do that is

2  to ignore a key fact in this case.  And the government may not

3  like that fact, but it's a true fact and it's undisputed.

4          Well, what else do you know?  Let's start from

5  the beginning.  We know she's a daughter.  She's a mother.

6  She's a friend.  She's a coworker.  She had a good reputation

7  at work.  She was a hard worker.  She was elected to be a

8  trusted steward.  That's who Lisa Coffman is.  And you also

9  heard that she was honest and law-abiding from every witness,

10  and that was unrebutted.  They didn't bring anybody here to

11  tell you, Oh, no, she's a criminal.  Oh, no, she has some

12  criminal record.  Oh, no, she's a dishonest person.  Do you

13  know her to be dishonest?  No, sir.  No, ma'am.  No.

14          And the Judge told you in the jury charge that

15  based on character evidence alone, you can find a reasonable

16  doubt.

17          It went unrebutted, she gets hurt.  She's on the

18  job.  And think about that injury, folks.  Starting in May of

19  2011, her life changed.  That was an injury that altered her

20  life.  Every part of her life changed.  I mean, you heard about

21  it from the various witnesses, that her life became a series of

22  going to doctors' appointments.  You know, we expect that when

23  we get into our late 80s if we live that old, that our life

24  will become that.  You know, it's like you get punished for

25  getting old.  You don't expect it when you're a younger person.

 1   This is a younger person who was working hard.  She was at work

 2   when she got hurt.  She wasn't knocking over a bank.  She

 3   wasn't engaged in criminal activity.  She was at work, at the

 4   post office, doing her job, and she got hurt.  And then what

 5   did she do?  She went to the doctors.

 6            And let's think about that.  She went to the

 7   doctors.  And why did she go to the doctors?  Because she was

 8   in pain.  She was in back pain.  We've all had pain.  Some of

 9   us have greater pains than others.  But imagine a pain that

10   persists year after year after year after year, daily.  You

11   probably all know someone that lives that way.  It's a

12   miserable existence.  So, what did she do?  She went to the

13   doctors.  She woke up in pain.  She lived in pain.  She went to

14   the doctors.

15            She saw doctors 2011, '12, '13, '14, '15, '16,

16   '17.  She saw many doctors.  There's a time honored

17   relationship between doctors and patients.  It is a

18   relationship built on trust.  Those of us that aren't doctors

19   have to trust that our doctors will do their best in caring for

20   us.  Now, we saw a good doctor here.  There are good doctors.

21   She did her best for our client, Ms. Coffman.  But you also

22   heard Ms. Coffman saw many other doctors, some even willing to

23   put her on morphine.  The relationship between doctor and

24   patient is one of trust.

25            Ambien is supposed to be, according to the

1    general understanding, and the doctor agreed, is a short-term

2    medication for sleep.  People should be put on it for a couple

3    of weeks maybe.  Buying a prescription -- and what y'all heard,

4    she's been on Ambien for years.  And you heard the doctor

5    agreed, that there are cases where Ambien messes people up so

6    much, they get up and go out and do crazy stuff.  They don't

7    even know what they've done.  They go out and drive a car.

8    They mow their yard.  It's dangerous.

9               What did you hear Lisa Coffman's mother say, and

10   her friend?  They were concerned for her.  Can't talk to her

11   about the meds she was on.  Did they just come in here and make

12   that up?  No.  They said that because in her life they have

13   been concerned about the effect of the medication on her.  They

14   don't know anything about billing.  They were concerned about

15   the daily effect the meds have on her.  And they urged her to

16   do something about the meds.  But you know what, she relied on

17   her doctors, which is what we're supposed to do.

18              These aren't street meds, folks.  This isn't

19   somebody going out there on the street corner scoring

20   medication, scoring dope.  This is somebody who's getting

21   prescriptions from their doctor and trusting their doctor,

22   which we are supposed to be able to do.

23              And what did these doctors give her?  Vicodin,

24   hydrocodone, which there's a link there.  Methocarbamol,

25   Trazodone, Tramadol, Ambien, and then ultimately morphine.

1          What did we hear?  One of the things we heard,

2   that people develop a tolerance, which is quite obvious,

3   because the medications increased over time.  She's not on the

4   same medicine she was on when she first got hurt.  She's now on

5   morphine.  She's wearing a morphine patch, according to her

6   mother.  A morphine patch, that wouldn't affect somebody's

7   judgment?  Vicodin, year after year after year?  I mean, you

8   know, this stuff starts to add up and starts to impact.

9          And how do we know that?  What did her witnesses

10  tell you, the people that I called?  They said, Well, her

11  clarity of thought was messed up.  They'd have a conversation

12  with her, a normal conversation, and then all of a sudden,

13  she'd lose focus.  They didn't say this was just one particular

14  time of day.  This was -- they said this happens.  They'd have

15  to redirect her to the conversation.  Everyone of them said

16  that, and that this happened over a period of time.

17         What else did they tell you?  And this is pretty

18  important.  They told you she was forgetful.  She would see on

19  her phone their name; and she'd say, Hey, did we talk

20  yesterday?  What did we talk about?

21         Now, why is that important?  Because if a person

22  is submitting bills to the government for their miles, 50 cents

23  a mile and they're forgetful and they're not keeping records of

24  what they submitted and they've got lousy records to begin with

25  because they're forgetful, are they going to create accurate

1    records for the government to rely on?  No, not at all.

2                 And the government acts angry about this -- not

3    angry, but the government's, you know, indicted and seeking

4    conviction.  But, I mean, it's like a parent giving their kids

5    sugar or taking them to McDonald's every day and then get upset

6    that they're fat.  The patient, the injured worker is sent to

7    the doctors for treatment, given heavy medication, and then

8    submits bills that are inaccurate, totally inaccurate, grossly

9    inaccurate.  What else would you expect from a person that's

10   heavily medicated?  I'd be shocked, based on the evidence, if

11   she could produce any decent records.  But yet she's put on

12   medication for being injured.  She's on morphine, yet she's

13   supposed to be doing all right.

14                 Mr. Odom has relocated to signal me that my time

15   is almost up.  My time is almost up.

16                 When you look at these records and they're in

17   evidence --

18        THE COURT:  Actually, I don't think your time is

19   almost up, according to my chess clock.

20        MR. FICKMAN:  Well, 15 and 15.

21        THE COURT:  Oh, oh, Mr. Odom wants to get up and talk,

22   too.

23        MR. FICKMAN:  Yeah.  Sure.

24        THE COURT:  Okay.  Sorry, sorry, sorry.

25        MR. FICKMAN:  Thank you, Your Honor.

1          Look at these things.  You look at the date
2    they're signed and then you look at the dates on here and you
3    look at them and they're all over the place.  And you know
4    what, I'll summit to you that that reflects that's coming from
5    a confused mind.  That's not a -- those aren't the way you
6    would present accurate records.  In fact, they have a red flag,
7    anybody who's actually looking at it, now that you know what
8    they're looking at.  So, if you look at these submissions, they
9    represent chaotic thought.  What else -- from painkillers.

10         Ladies and gentlemen, we talked about this during
11   the voir dire and that is quite simply this:  If at the
12   conclusion of this case you have a reasonable doubt, that is to
13   say, you are not convinced beyond a reasonable doubt, then your
14   duty is to say not guilty by your verdict.  So, if you think
15   possibly Ms. Coffman is guilty or probably she's guilty or
16   there's more evidence against her than not, but you're still
17   not convinced beyond a reasonable doubt, then your sworn duty
18   in this court of law is to return a verdict of not guilty.  And
19   when a jury has a reasonable doubt and they return a verdict of
20   not guilty, then justice has been done.  Justice has been done.
21   It doesn't mean that they didn't present any evidence.  It just
22   means you followed your oath.  And we expect nothing less.

23         *MR. ODOM:*  Ladies and gentlemen, we've divided up our
24   argument; and I will talk more about the specific facts that
25   you heard in this particular case.  Before I do, I would like

1   to make some overviews.  It's sort of interesting, when you

2   were first selecting -- we were selecting the jury, there was a

3   gentleman that stood up and said that, well, I don't know that

4   I could be fair and impartial because of all the resources the

5   government has and certainly someone must be guilty.  And I

6   sort of after 44 years of prosecuting and defending cases, I

7   sort of chuckled to myself, because of what I know.

8           How did we get here?  And that made me think

9   about it.  How did we get here?  And we didn't get here because

10   the government is malicious.  We certainly didn't get here

11   because there's a lack of intelligence, I know that.  Nor did

12   we get here because that they have any personal ill-will

13   towards Lisa Coffman.  Now, the reason we got here and the

14   reason we're here is because there were some false assumptions

15   that were made.  And there were five really big false

16   assumptions that got us to this point.

17           And they are, number one, they assumed that Lisa

18   Coffman knew all of the OWCP rules.  They just assumed that she

19   knew all about which rule applies to what, that it's only at a

20   doctor's visit.  They just assumed she knew what you have to

21   leave from, what you're supposed to put on the form.  That's

22   the first big assumption.

23           The second big assumption they made that was

24   false was that they assumed that the defendant's vouchers,

25   these 957 forms, were for scheduled doctors' visits and

1   scheduled rehab visits.  They just assumed that.  That's what

2   the rules are; so, therefore, they just assumed that's what she

3   thought.  Right?

4              The third false assumption was, that they assumed

5   that her mileage is from her mailing address.  That was their

6   next -- their next false assumption they made in this case.

7              The fourth false assumption was that when she

8   filled out these forms, especially in 2016, that she was not

9   under the influence of opiates.

10             And the final false assumption they made, was

11  that they assumed that there was not someone from the

12  government, some bureaucrat that was telling her whenever she

13  did a false return, that it was okay.  What do I mean by that?

14  What I mean by that is when Lisa Coffman fills out a form and

15  it says, I'm going to see a doctor that's not approved, some

16  bureaucrat from the ACS or from Department of Labor or the RADR

17  program, or whatever it is, that can see that the document does

18  not match the documentation, what do they tell Lisa?  You can't

19  do that, is that what they told Lisa?  No.  For over -- for six

20  years they told Lisa that is okay.  What you did is okay.  When

21  you went to the pharmacy, that was okay.  We're going to

22  approve that and give you money for it.

23             Those are five huge false assumptions.  Now, they

24  don't make it right, what Lisa Coffman did.  They don't mean

25  that Lisa Coffman doesn't owe them a beaucoup amount of money,

1  but it does mean that she doesn't go to the penitentiary for
2  false assumptions, for those five false assumptions.  And
3  that's what this is all about.  That's what we're really
4  talking about here.

5          The Judge tells you in her instruction something
6  that I want to emphasize and focus upon.  And I think you get
7  these written instructions when you go back there.  But if you
8  do, they're on page 7.  But I want to reread it.  You're
9  instructed that a violation of civil statutes, rules,
10  regulations, ethical standards, and standards of care is not a
11  crime.  This is not a civil case.  Ms. Coffman is not on trial
12  for a civil violation.  Even if you the find the claims were
13  not allowable under the applicable statute, rules, and
14  regulations, Ms. Coffman cannot be convicted of a crime merely
15  for breaching civil standards, rules, regulations, ethical
16  standards, and standards of care applicable to her conduct.
17  However, Department of Labor's rules, regulations, ethical
18  standards may be relevant in determining where she acted with
19  criminal intent knowingly, willfully, with the intent to
20  defraud the Department of Labor.

21          So, back in 2016, they could have said,
22  Ms. Coffman, we're not going to honor this.  This is not right.
23  Or in 2018 they could have said, This is a civil dispute.
24  We're going to dock you from your future pay.  You owe us
25  money, and she's got to pay them a bunch of money.

1          The question here is whether those false

2    assumptions they're making is doubt, and is that doubt

3    reasonable doubt.  And I would submit to each and every one of

4    you, that each one of those false assumptions, the fact that

5    they made those false assumptions, even in the best of

6    intentions, is reasonable doubt to say that this lady owes the

7    government a bunch of money, but this lady is not a criminal.

8          Let me give you more details.  Number one, let's

9    talk about it.  Let's talk about the OWCP rules.  Ms. Russell

10   is going to come and answer all of our questions about the

11   rules.  Ms. Russell knows these rules.  She knows them

12   backwards and forwards.  Mr. Ponder knows the rules.  These

13   government lawyers know these rules.  Even I've learned a few

14   of these rules.  But when we got down into it, when you start

15   talking about doctors that are not approved, do you recall that

16   she stated under oath, she agreed with Mr. Fickman, that in

17   order to avoid undue delay in your recovery, you may choose to

18   arrange for the testing procedure or doctor procedure at your

19   own expense or through your private insurance?  If you choose

20   to do this, you or your provider will be reimbursed for the

21   expenses incurred if and when this office is able to authorize

22   the requested procedure.

23         So, you have to have prior approval.  Wait a

24   minute.  You don't really have to have prior approval.  So,

25   what happens?  One of the rules says you don't have to have an

1  approved doctor.  Lisa Coffman doesn't have an approved doctor.

2  She tells that to Agent Ponder.  Well, I'm going to go see

3  Dr. Ninh next week.  Why would she think that it's okay?  I'll

4  tell you why she thinks it's okay.  Because they send her a

5  check every time she goes to see an unapproved doctor.  That's

6  why she thinks it's okay.  That's just one example of how

7  complicated these rules are.

8          Then we get to Government's Exhibit No. 2.  Now,

9  this is a particularly interesting exhibit, because this is

10  what Ms. Russell tells us that they give her to tell her to

11  follow.  Your claim has been approved.  "Dear Ms. Coffman, your

12  claim has been approved.  You have to have a Form C -- ooh, I

13  don't know what happened there.  There we go.  "You have to

14  have a form" -- it's hard to read.  "You have to have a Form CA

15  in order to get your workman's comp back."  That's all there.

16          So, what does Ms. Coffman do?  She goes and goes

17  to the doctor's office or to the rehab office or to any of

18  these other offices and what does she do?  She gets a CA form

19  to go back and take to her post office, so that she can get her

20  workman's -- her pay.  That she declares on her travel

21  vouchers.  They don't say you can't get that money.  As a

22  matter of fact, Ms. Russell indicated you might could get that

23  money if you fill out yet another form.

24          Ms. Coffman fills out that form as a doctor

25  visit.  They count that as not a scheduled doctor visit.  They

1    count that as a rule and regulation that she must know.

2          And this is the best part, authorization and

3    expenses.  I went through this line by line with Agent Ponder

4    and said, Where does it say in here that you have to go to a

5    doctor that's preapproved?  And that's one of the reasons they

6    want to tell you that this is a crime, is because she's going

7    to preapproved doctors.  That is a false assumption.  They're

8    assuming she knows these rules as well as Ms. Russell does, as

9    well as these good people at this table do.  And she didn't.

10         She thought every time she went to do something

11   that was medically related, she's entitled to get reimbursed

12   for it.  That's wrong, but it's not criminal.  And that's not

13   what she meant it to be.

14         The next thing is that you look at this form that

15   she fills out.  This is the 957 form, and this, I thought, was

16   particularly interesting.  When you look at these forms, there

17   really isn't any way for her to say exactly where she's going,

18   where she's leaving from, and what she's doing.  Nowhere in

19   this form does it say, like on this one right here, where she's

20   going for weight loss.  As far as she's concerned, it's a

21   medical procedure.  Her weight loss causes her back to be hurt.

22   So, she goes to Dr. Caldwell-Johnson.  There's nothing in here

23   that says where you put that or how you put that or what's the

24   proper way to put that or how you tell the government that.

25   And because you don't put that, they count that as a false

 1   statement, and they want you to believe that she had criminal

 2   intent.  And that's the very one they pointed out, the one for

 3   Dr. Johnson.

 4              What about her address?  Claimant's/payee's

 5   address.  That's where you get your money.  You put your

 6   mother's address down there.  Why?  Because she lives in an

 7   apartment, and people steal mail from apartments.  Her mother

 8   lives in a house.  They don't steal mail from the house.

 9   That's not a criminal act.  That's not intent.  She's not doing

10   anything to deceive the government.  As a matter of fact, I

11   think she's doing a pretty good job of putting down her

12   correct -- claimant's correct address.

13              One of the things that I thought was most

14   particularly impressive about pointing out that she neither

15   understood the procedures or that they understood what she was

16   doing was not scheduling doctors' appointments, is when you

17   look at some of the exhibits which indicates that she is not

18   going to a doctor's appointment and it's clear that she's not

19   going to a doctor's appointment.

20              Look at Exhibit 3, 116.  And I highlighted it

21   down at the bottom.  You may not be able to read it very well.

22   But do you know what it says?  It says she is going to the

23   Houston district office.  The Houston district office of what?

24   Of the post office.  She is telling them on this voucher that

25   she is going to the post office.  And remember they were proud

1   to put up evidence that she was going to another address that

2   was the Roy Royall address that was another post office.  And

3   you know what that is?  That is where Ms. Coffman has taken the

4   form that she went -- she traveled from a doctor's office or

5   from a rehab center or from some office that's not a scheduled

6   visit, where she's gotten the medical documentation that she's

7   doing whatever she's doing, and she's taking it back to the

8   post office.  And she's telling them she's taking it back to

9   the post office.  Because otherwise if she didn't do that CA-7

10  just as Ms. Russell said she had to do to get work -- to be

11  compensated, she's telling them that's what she's doing.

12  That's not a scheduled doctor's visit.  She's not pretending

13  it's a scheduled doctor's visit.  But yet they are telling you

14  that this is a sign of criminal intent.

15          *THE COURT:*  You're almost done.

16          *MR. ODOM:*  I am?  Okay.

17          The next one.  Gallery Furniture.  Gallery

18  Furniture, she tells them they're not going to a doctor's

19  visit.  It's clear and evident that she did not understand the

20  rules.  They made the assumption that these are all doctors'

21  visits, and they aren't.

22          Mileage.  It's pretty clear, you heard from

23  Mr. Davis that he said, Look, I would drive from my house to

24  pick her up wherever she was, and we would then go to these

25  various locations.  She's counting all the mileage.  That may

1   be wrong.  But she's counting all the mileage.  She's paying

2   them back for what she thinks is her mileage.  She's

3   guestimating what it is and she's submitting it.  The

4   government assumes that the mileage is coming from the

5   Kingfisher address.

6           The final thing that I want to talk about is the

7   government's exhibit that they're so proud of, Exhibit No. 13.

8   Notice that this is all in 2016, from January to May of 2016.

9   Notice also that she didn't put down on one voucher that I was

10  there four days, I was there four days.  These are cumulations

11  of vouchers.

12          The Judge tells you not to hold it against my

13  client that she did not testify, and you swore that you would

14  do that.  If you have a problem with that, you talk to me.  You

15  talk to me after this is over, if you have a problem with that.

16  But you heard Aubrey Davis tell you, that, you know, he would

17  have to go back sometimes to get these vouchers.  You heard

18  all -- everyone that knows her tell you that she doesn't even

19  remember if someone's in the same house with her after they've

20  talked with her five minutes ago.

21          What you're looking at is duplicate and

22  reconstructive guesstimates of travel.  And you see it -- and

23  you can see this in the exhibits, in Exhibit No. 3, you can see

24  that, because she goes from detailed addresses like that to

25  just home to home, home to home, home to home, as she's trying

1  to figure out when she traveled.  And then she goes and tries

2  to do it again, because she didn't know -- she had done it

3  before.  She's doing it again, she's doing it again, and she's

4  doing it again.

5           Ladies and gentlemen, it is so difficult to stand

6  up here in a short period of time and for me to try to tell you

7  what's in here and try to make at it go out so that you'll

8  understand what I'm trying to say.  And I can only hope you do.

9           Mr. Escher is going to stand up.  He's going to

10 tell you things.  He's a good lawyer, I know well.  I've been

11 against him many times.  If I had an opportunity, I would

12 respond to it, but I'm not going to.  I rely upon you and your

13 common sense.  But, gosh, I hope, I hope, I hope, I hope, that

14 what I'm trying to say comes through and that you understand

15 there's a big difference between a false report and an intent

16 to criminally, criminally falsify something for the government.

17 Thank you.

18      *MR. ESCHER:*  And, Your Honor, how much time do I have?

19      *THE COURT:*  You have, since I gave Mr. Odom a few

20 minutes because I interrupted him, you've got an extra five

21 minutes.  So, you've got 20 minutes.

22      *MR. ESCHER:*  Okay.  Thank you, Your Honor.

23           Good morning, ladies and gentlemen.  I want to

24 show you again one of our famous exhibits, 957, in our Exhibit

25 3.  I'm going to try not to use the Elmo, because the last time

1  I looked, they don't have this in the jury room and you're
2  stuck with the big book.  So, I'll try to do it here.
3          I submit to you this is about a simple government
4  form as you're ever going to see.  It has room for not one but
5  three claims for travel reimbursement.  It doesn't require a
6  lot of information.  It just requires where you're going; it
7  requires the date; it requires you to check off one way or
8  round-trip; and check off from home to office, home to lab, or
9  whatever.  And there's a little box for how many miles.
10          There's been a lot of distraction in this case
11  about, oh, she didn't know that Kingfisher -- that's just a
12  mailing address and the instructions aren't clear of what
13  address to put there or whether you went from some place
14  besides your home.  That's all a big distraction.  There's a
15  box for how many miles you traveled.  And while they're at it,
16  the Kingfisher address isn't very far from her apartment.  You
17  heard that in the testimony yesterday.  Ten minutes maybe,
18  under 10 miles for her, maybe as short as 4.  That's a
19  distraction.  You're talking about pennies in any kind of
20  travel thing.
21          But what would really govern this reimbursement
22  voucher is how many miles she put in here.  And if you look at
23  our Exhibit 9, on the second page, and the ones we claim were
24  unsupported, sometimes, for example, with Allied Medical, the
25  435 claimed visits she claimed, she sent -- claimed five

1  different mileage amounts for her various visits.  31 visits at

2  34 miles.  20 visits at 58 miles.  204 claimed at 62 miles.  If

3  she was going from another location, it got captured on that

4  form where you put in how many miles.  And that's why we had to

5  break out all of these different amounts of miles even to the

6  same medical facility.  That's all been a red herring.  That's

7  all been a distraction.

8           Ms. Coffman has been working for the federal

9  government since she got out of high school, since she was 18

10  years old.  That's what her mother said on the witness stand.

11  I suggest to you that anybody working for the federal

12  government can fill out a form as simple as this or find out

13  how to do it.  And I further suggest to you that at the bottom

14  of each one of these forms, a federal employee since high

15  school would understand, I am aware that anyone who makes a

16  false statement or misrepresentation to obtain reimbursement

17  from OWCP is subject to civil penalties and/or criminal

18  prosecution.  I suggest it's preposterous for a federal

19  employee of her length not to know the importance of these

20  forms.

21           We heard testimony -- we heard testimony

22  yesterday from Mr. Garner, the man from -- the gentleman from

23  the post office, who was the chief steward, the one who

24  represented her at the interview with Special Agent Ponder, and

25  you know what he said about Ms. Coffman?  That her peers

1    elected her a steward just like him, and that a steward's duty

2    would be to represent fellow postal worker employees at

3    disciplinary hearings and in disagreements.

4             Now, we didn't hear more testimony about what

5    Ms. Coffman did as a steward, but I think it's a reasonable

6    inference -- we argue that it's a reasonable inference for you

7    that someone who has been elected by their peers to represent

8    them in disagreements and disciplinary might be better than the

9    average postal worker in filling out a form such as this.

10            Then we heard a lot of testimony, a lot of

11   argument in this trial about Ms. Coffman's drugs and

12   medications.  And if you recall Monday night, we had a

13   physician, one of our witnesses was a physician, Dr. Caldwell.

14   And the defense cross-examined her at good length, taking

15   advantage of her medical knowledge to explain the effects of

16   Ambien, to explain the effects of this drug, and then could

17   there be chain reactions from the multiplication of drugs.

18            Do you remember when I redirected her, I went

19   back after cross to question her at the end, and I said,

20   Dr. Caldwell, did Ms. Coffman show examples to you of any of

21   this -- any of these effects of these medications or these

22   chain reactions?  And don't you recall her response?  She

23   smiled and looked at me and said, "No."  And Dr. Caldwell

24   further testified that she explained to Ms. Coffman that you

25   could not bill weight loss sessions with Dr. Caldwell for

 1   workers' comp.  And Dr. Caldwell testified that her patient

 2   understood her.  And yet Ms. Coffman billed for one of those

 3   sessions.

 4            And then Special Agent Ponder testified at the

 5   end, that he interviewed Ms. Coffman on May 20th of 2016, and

 6   there were some very serious answers that she made to him

 7   during that interview.  One, that she was paying for her foot

 8   surgery from Dr. Tri Le, ankle down, with her private carrier,

 9   private insurance carrier.  That indicates she knows her

10   workers' comp doesn't pay for foot surgery.  She had a back

11   injury.  She knew that.  It only stands to reason she'd know

12   she can't take travel reimbursements to a foot doctor.  That's

13   common sense.  And yet in our Exhibit 9, look how many she

14   claimed -- how many travel reimbursements she claimed to

15   Dr. Tri Le.  It was 207 -- I'm sorry, I'm reading the wrong

16   one.  169 claimed visits to a doctor she knew was not treating

17   her for her workers' comp claim.

18            She also told Special Agent Ponder that she was

19   going to Dr. Ninh and doctor -- and to Ergo Rehab three times a

20   week.  That's right after these months where she had put in all

21   these claims.  She was aware that she could not be charging

22   this kind of mileage reimbursement request.

23            And then I want to talk a little bit more about

24   Ms. Coffman's family.  She called her mom in here to testify

25   for her.  Her mom said that she's been married 47 years to her

1  dad.  He was retired from Maxwell and she was retired, I think,

2  from the store, Rice Epicurean.  The mom said that Ms. Coffman

3  really didn't spend much time at her house overnight but could

4  visit and she speaks to Ms. Coffman about every couple of

5  months, as I recall the testimony.  Your memory may be better

6  than mine.  But it didn't sound like a situation where

7  Ms. Coffman is having to go stay at her mother's house, as

8  close as it was, because she was having so much trouble.  And

9  it seemed to me that the family was pretty stable, and the

10 mother was interested enough to come here and testify for her,

11 that Ms. Coffman could live on her own in an apartment all this

12 time.

13          And then when Ms. Coffman's daughter testified,

14 we find out that in 2011 when this injury occurred, Ms. Coffman

15 had a 9- or 10-year-old son and a teenage daughter who just got

16 her driver's license.  And she has managed to stay in that

17 apartment and live with them up till now.  And you saw the

18 23-year-old now daughter.  You can size her up and see whether

19 you think she appears to have been from a fairly stable

20 situation.  I submit to you if you can stay in your apartment

21 with a back injury, rambunctious kids, trying to get back to

22 work, you can fill out these forms correctly.  There's a lot

23 more paperwork involved in doing those things than filling out

24 this little form.

25          When we put this Exhibit 13 up early on in our

1  case with a witness, Barbara Russell, the defense was shrewd to
2  get up and call it ludicrous, get it out fast.  Let us be the
3  first to say this can't be true.  We have a much uglier name
4  for this than ludicrous.  Willful, intentional, criminal.
5          When I was doing the voir dire in this case, you
6  can remember that just a couple mornings ago, one of the last
7  questions I asked was, does everyone here agree that you have
8  to follow the law even if you have a back injury?  I saw no
9  hands.  Ms. Coffman has a back injury.  She's getting
10 treatment, and we're paying -- the government is paying for it.
11 She's getting travel reimbursements she deserves.  But what
12 Ms. Coffman did, I submit the evidence shows, is that she
13 realized she could get travel reimbursements for just about
14 everything and just started multiplying it willfully,
15 knowingly.  There couldn't be a moment where she couldn't be
16 lucid in the last seven years.  My goodness, look how she's
17 lived her life.  And she could not be said to not know what
18 she's doing.  Her own peers elected her to be a steward to help
19 with disagreements perhaps similar to this.
20         Ladies and gentlemen, the evidence is clear, we
21 submit that it's overwhelming, that this defendant is guilty
22 beyond a reasonable doubt on both counts.  Now, I know what's
23 crossing your minds.  You're worried somebody does have a back
24 injury.  The Judge is going to charge you -- well, she's
25 already charged you.  You can't decide this case on sympathy.

1    People with back injuries have to obey the law, too.  What's
2    going to happen to Ms. Coffman, that's not your concern.
3    You've got to trust this Judge.  You don't handle sentencing in
4    this case.  She does.  She's trusting you to do what you swore
5    to do, to tell it like it is.  And if you don't tell it like it
6    is, what she has really done, there's no point to any of us
7    ever coming here again.  So, we ask you to return a guilty
8    verdict on both counts.  Thank you.
9              THE COURT:  All right.  Ladies and gentlemen, you have
10   heard all the evidence in the case.  You've heard my charge to
11   you on the law, which you will be taking back with you to the
12   jury room, so you can consult it if you need to.  And you've
13   heard the arguments of counsel.  So, it's now my pleasure to
14   ask you to retire to deliberate.  But there's just a couple of
15   things.  Number one --
16         (Judge conferring with case manager.)
17             THE COURT:  You're going to take the jury form -- I
18   mean, the charge back, also, the verdict form that I talked to
19   you about that is the verdict.  And there are some blank jury
20   notes.  If you need to get in touch with me, to ask me a
21   question or let me know something, there's a place for the
22   foreman to write the question and then there's a place for me
23   to answer it if I can.  If I can't answer it in writing, then I
24   will bring you back in the courtroom and give you the answers.
25   So, you're going to take these things back with you.

```
 1              Now, don't make your first question be:  Where's
 2   the evidence?  Because we have to gather it up, make sure we've
 3   got the right things, and get it back to you.  So, it will take
 4   a few minutes for us to do that.  So, we are going to give you
 5   the evidence.
 6              Please do not deliberate outside the jury room
 7   and please wait until everybody is there to deliberate and
 8   don't deliberate in clusters.  Everybody should be listening to
 9   everybody else when you're talking about this.
10              All right.  I'm going to hand this to the
11   marshal, and he's going to escort you-all back.
12              And I'm going to ask ███████████ and ████████ to
13   please remain in the jury box.
14        (Jury not present.)
15        THE COURT:  Please be seated, everybody.
16        ██████████████ and █████████, I am so very sorry
17   that I have to inform you that you are the alternates.  And it
18   especially troubles me because you-all were so awake and alert
19   and listening to every word of this trial, and I know you're
20   disappointed that you don't get to go back with the other
21   people and deliberate.  That's the bad news.  The good news is
22   you're released from all of my instructions.  You can talk to
23   anybody you want to about the trial.  You can go back to work
24   or back home or wherever you would like to go.  And sometimes
25   the lawyers like to talk to the alternates.  If you want to
```

 1  talk to them, you may.  If you don't want to, just say, I don't

 2  want to talk to you, and they'll leave you alone.

 3           Please let Ms. Hawkins know if there's some

 4  item -- your personal item that you've got in the jury room.

 5  She'll go back and get it for you and give it to you.  Now,

 6  please, if you should bump into any of your ex-fellow jurors,

 7  please do not talk to them about the case, but anybody else,

 8  you can talk to about the case.  Thank you very much.  And you

 9  can take your notes with you and just -- but leave the

10  notebooks or you -- if you leave them there, if you don't want

11  to take them with you, we'll shred them and nobody is ever

12  going to know what you wrote down.  Yeah, just leave them in

13  your chair, and she's going to go get your things.

14           In the meantime, I would like to have the parties

15  pull together the evidence that was admitted and --

16           MS. BASILE:  Your Honor, I just had one question.  Do

17  you want the exhibit list with the evidence?

18           THE COURT:  No, no exhibit list.

19           MS. BASILE:  Okay.  Let me take those out.  What about

20  the indictment?

21           THE COURT:  I don't think there's a need -- I mean, I

22  quoted from the relevant portions --

23           MS. BASILE:  Yes.

24           THE COURT:  -- I think.  I don't think there's a need

25  for the indictment.

1          Thank you-all very much.

2      *(10:57 a.m., Jury deliberating.)*

3      *(12:07 p.m. Open court, defendant present, jury not*

4  *present.)*

5          THE COURT:  Please be seated, ladies and gentlemen.

6              We have a note from the jury, which reads:  "The

7  jury has come to consensus."  I guess that means they have a

8  verdict.  I don't know.  I'll ask them.  I'm going to bring

9  them in now.

10     *(Jury present.)*

11         THE COURT:  Please be seated, ladies.  I understand

12 from the note, that you-all have reached a verdict; is that

13 correct?

14         THE FOREPERSON:  (Nods head.)

15         THE COURT:  Who's the foreman?

16         THE FOREPERSON:  (Raised hand.)

17         THE COURT:  I'm going to -- would you hand the verdict

18 form to the marshal, please.

19             Listen carefully as I read the verdict; and then

20 I'm going to ask each one of you if that is, in fact, your

21 verdict.

22             United States of America versus Lisa Yvette

23 Coffman, Criminal No. H-16-460.  Verdict.

24             On Count 1:  We, the jury, find the defendant,

25 Lisa Yvette Coffman, guilty.

1          On Count 2:  We, the jury, find the defendant,

2   Lisa Yvette Coffman, guilty.

3          And the verdict form is signed by ███████████,

4   and dated June the 13th, 2018.

5          Is that your verdict, ████████?

6          *JUROR NO. 1:*  Yes, ma'am.

7          *THE COURT:*  Is that your verdict, █████████?

8          *THE FOREPERSON:*  Yes, ma'am.

9          *THE COURT:*  Is that your verdict, ███████?

10         *JUROR NO. 3:*  Yes, ma'am.

11         *THE COURT:*  Is that your verdict, ████████?

12         *JUROR NO. 4:*  Yes, ma'am.

13         *THE COURT:*  Is that your verdict, █████████?

14         *JUROR NO. 5:*  Yes, ma'am.

15         *THE COURT:*  Is that your verdict, ██████?

16         *JUROR NO. 6:*  Yes, ma'am.

17         *THE COURT:*  Is that your verdict, ██████?

18         *JUROR NO. 7:*  Yes, ma'am.

19         *THE COURT:*  Is that your verdict, ███████?

20         *JUROR NO. 8:*  Yes, ma'am.

21         *THE COURT:*  Is that your verdict, █████████?  Say

22   "yes" or "no," please.

23         *JUROR NO. 9:*  Yes, ma'am.

24         *THE COURT:*  Is that your verdict, ███████?

25         *JUROR NO. 10:*  Yes, ma'am.

1    *THE COURT:*  Is that your verdict, ██████████?

2    *JUROR NO. 11:*  Yes, ma'am.

3    *THE COURT:*  Is that your verdict, ██████████?

4    *JUROR NO. 12:*  Yes, ma'am.

5    *THE COURT:*  Your verdict is accepted and will be filed

6    among the papers of the court.  Let me tell you how much we

7    appreciate your coming down and being with us all these few

8    days and listening intently to the evidence and reaching a

9    verdict in this case.  You've performed a very essential public

10   duty.

11           You are now released from all my instructions.

12   You may talk about the case to anybody you want to.  Sometimes

13   the lawyers like to talk to the jurors.  If you want to talk to

14   a lawyer, you may.  If you don't want to, just tell them, I

15   don't want to talk to you, and they'll leave you alone.

16           Please take with you everything you did not bring

17   with you this morning to the courthouse.  Please leave your

18   notebooks in the jury room.  If you want to take the notes you

19   took with you, you may.  But if you don't, just leave them

20   there and we'll shred them later, so nobody will ever know what

21   you wrote down in your notebook.  And thank you-all very much.

22   And you are excused.  Thank you.

23       *(Jury not present.)*

24           *THE COURT:*  Please be seated, ladies and gentlemen.

25               Ms. Coffman, having been found guilty of Counts 1

```
 1   and 2 of the indictment, I'm ordering a presentence report to
 2   be prepared.  By August 3rd, 2018, the initial presentence
 3   report will be disclosed to counsel.  By August 17th, 2018,
 4   counsel shall file either objections in writing to the facts of
 5   the offense, the application of the sentencing guidelines, or a
 6   statement that there is no objection.  By August 31st, 2018,
 7   the probation officer shall submit to the Judge the final
 8   presentence report with an addendum addressing contested
 9   issues.  Sentencing is set for September the 14th, 2018, at
10   10:00 a.m.
11              Anything else?
12       MR. FICKMAN:  No Your Honor.
13       MR. ODOM:  What was that?  Pardon?
14       THE COURT:  Anything else?
15       MR. ODOM:  Not from the defense, Your Honor.
16       THE COURT:  What about taking Ms. Coffman into
17   custody?  Are you-all asking not to have that done?
18       MR. ODOM:  We're waiting for that next issue.  But,
19   yes, Your Honor, we would request the Court to consider the
20   fact that she's been on bond for quite a period of time.  She's
21   made all appearances.  She's always appeared at our office when
22   requested.  She has solid family, which is here.  And she
23   essentially doesn't have anyplace to go if she were placed --
24       THE COURT REPORTER:  Can you use the mike?
25       MR. ODOM:  So, we would request a bond, Your Honor.
```

```
 1            THE COURT:  All right.  Any objection?
 2            MS. BASILE:  No, Your Honor.
 3            THE COURT:  All right.  Then, Ms. Coffman, you may
 4   continue on bond.  And please obviously show up at the
 5   sentencing hearing.
 6                 Thank you-all very much.
 7            MR. FICKMAN:  Thank you, Judge.
 8            THE COURT:  You may be excused.  Thank you.
 9        (Concluded at 12:28 p.m.)
10                           * * *
11   I certify that the foregoing is a correct transcript from the
12   record of proceedings in the above-entitled cause, to the best
13   of my ability.
14
15   /s/ Kathy L. Metzger                    12-15-2018
     Kathy L. Metzger                     Date
16   Official Court Reporter
17
18
19
20
21
22
23
24
25
```